All right. Mr. Warner, please proceed. Thank you. May it please the court. I'm Jake Warner here on behalf of Plaintiff's Appellants. Four years ago, Students for a Conservative Voice, a registered student group at the University of Minnesota, desired to bring popular conservative speaker Ben Shapiro to campus for a lecture. But the group hit a roadblock. While university officials had allowed many other high-profile speakers to appear in big venues on main campus, including sitting U.S. Supreme Court justices, Democratic presidential candidates, and even an accused terrorist, officials closed those same venues to Mr. Shapiro. And the reason? Mr. Shapiro's conservative viewpoint. To be sure, officials invoked security concerns for this decision, but the official security concerns and their corresponding responses vary widely depending on the speaker's viewpoint, as this case perfectly illustrates. Sixteen minutes after learning of the talk and four months before the planned event, and knowing only that Mr. Shapiro was a conservative speaker, President Kaler said this, I do not want this in the middle of campus. And from that moment forward, officials applied their standard list large events policy to banish the Shapiro event to a remote venue, 15 to 20 minutes away from main campus by car. That move was a significant... Counsel, what would have been the difference in terms of accommodation between the facility where the event actually occurred and the event facility that you sought to have? The two big things, Your Honor, are size and accessibility for students. The remote campus where the school placed the Ben Shapiro event is 15 to 20 minutes away by car, and the venue is smaller than many of the main venues on campus. What the record shows here is that there were hundreds of students on the wait list, and 94 percent of the campus students, they live on the main campus, not the St. Paul campus. And the record also shows that many students never even go to the St. Paul campus during their whole tenure at university. Yet, the university invokes security concerns to move the Ben Shapiro event far away from main campus to this remote location. And I think it's important to compare how the university treated Ben Shapiro to how it's treated other speakers with perhaps more preferred viewpoints. How was an objection made to the university, and how were they put on notice that the facility where the event ultimately took place was not adequate for the anticipated program? Well, I think we need to go back to the very beginning. Four months before the scheduled event, the Students for a Conservative Voice requested multiple venues on main campus, including Mayo Auditorium. That was the very first venue requested. The students said, we want this venue, please do not move this venue. Well, campus officials placed that request on hold, and eventually students requested other venues, including Wiley Hall. And then officials basically put that on hold and gave students only one option, the faraway St. Paul venue. And then once the event started selling out and hundreds of students were on the wait list for tickets, the students went back to the administration 10 days before the scheduled event and asked for a different venue to accommodate the large number of students. So 10 days before, the students asked for Wiley Hall. And we know compared to other events, the university has moved heaven and earth essentially to get these events in the best venues and the safest venues on main campus. For example, there's evidence in the record of some events, including an event, including Representative Omar, that was moved within one week of the scheduled event to accommodate a larger audience. But when we look at who the university has hosted on main campus in the past, we see that they have hosted the President of Somalia in the 2700-seat Northrop Auditorium. That was very close to many of the venues that the students requested here. And the university police had seen videos of suicide bombers attacking President Mohammed's palace in Somalia. And students were really upset about this event being hosted on campus, as shown by the over 100 protesters that arrived calling President Mohammed a genocidal warlord. Lieutenant Buddha said this was the biggest the same venues that people like this have appeared on. Another event on campus is the Representative Omar event. In the months leading up to her appearance on campus, she appeared at events with over 1,000 protesters. And she received over hundreds of death threats in the days leading up to her appearance. But the university secured Mayo Auditorium on one day's notice, far less than the 10 days notice and certainly less than the four-month notice that the students for a conservative voice gave the university here. And when it comes to the security interest here, the university's own analyst confirmed three times that there was no credible threat to the venue, to the speaker, or the audience. And that same report said that there was no credible threat of protest at the event. And then add on top of that, there's an unrebutted expert report in this case that found that the more attractive main campus venues had been secured for equal or higher security threats than the Ben Shapiro event. And that the university could have applied the exact same resources that used for the St. Paul event to secure any of those main venues on the Minneapolis main campus. Council, the university seems to argue that because some of these other speakers were sponsored either by the university or outside groups, that there's no viewpoint discrimination here. Can you address that? Yeah, that's not correct, Your Honor. The other events are not relevant as comparators based on who hosts them, but instead because they show the university's judgment about security risk and they show how the university responds to those security risks. And I think the Gerlich case is particularly instructive here, Your Honor. That case would not have turned out differently had the university's trademark office opened up its forum to outside groups in addition to student groups. What matters is the viewpoint discrimination and the relevant factors for that analysis are the forum, the speaker's viewpoint, the university's interest invoked, and the scrutiny applied. And when you look at all the factors here, Your Honor, it's clear that the university discriminated against these students from the very beginning. From the very beginning, Director Dussault applied the large scale events policy in a way that he had never done it before by his own words. The university had, for example, hosted the King event, an event with Sean King, which would have and should have triggered the policy because it had more than 100 expected attendance. But the university didn't even apply the policy to that event. Also, the university refused to move the Shapiro event as they'd done for other campus events. For example, the accused terrorist event was moved on less than one week notice and then the representative I'm sorry, secured on less than one week notice. And the representative Omar event was secured on one day notice. And when you look at the president's reasons for not moving the Shapiro event,   the president justified the university's actions by saying Mr. Shapiro is a conservative speaker. That's what he said at a press conference. He said that Mr. Shapiro was controversial because his speeches attract protesters with opposite views. But from Burnham, we know that's a heckler's veto, plain and simple. The president can't look at the students' reaction on campus and say this is going to cause too much controversy and shuttle Ben Shapiro to a court as any more questions at this time. I do have one question. Does the advent of live stream and the fact that this event was live streamed, which which enabled many, many people who were not able to get a seat in the in the hall itself, does that change the equation or the how does that impact how we should consider these issues? You know, the same argument could be made for any venue, even large venue on main campus. And the fact still remains that the university disallowed countless students from appearing in person and their tangible benefits to hearing the lecture in person. When you're there to engage with the speaker and then there's a question and answer session that you can get the biggest venue possible to allow for maximum student engagement. But the university officials here did not allow that. And unless there are any more questions at this time, I'd like to reserve the balance. I do have one more, if you don't mind. Could you draw from the record here that the on-campus organization, the students for conservative voice agreed to the relocation or to the to the move to the St. Paul campus? I don't know what struck me. I don't see anything in the record where the organization objected or, you know, put it, put it, asked that it be noted for the record that they objected to the assignment of space. What's your how do you view that? No, your honor. From the very beginning, the students requested large main campus venues and the university either placed them on hold or cut them off, slammed the door to those venues altogether. Essentially, the university said, hey, we have these venues over here. Here's what left. And of course, the university officials had all the power in this situation. And the students said, OK, well, I guess the St. Paul venues, the only one we have. So we'll accept that because all other doors have been shut at that time. But the students didn't rest there. Ten days before the scheduled event, the students went back. They asked for Wiley Hall, a main campus venue. And then that same morning, Vice President Berthelsen said, we're not going to move the event. And that was different from how the university treated others. So it's not fair to say that the students did not request main campus venues repeatedly over four months and were treated differently than speakers with other viewpoints. Thank you, Mr. Warner. Ms. Gallia. I'm sorry about that. Thank you, Your Honor. Good morning, Your Honors and Mr. Warner. And may it please the court. My name is Carrie Ryan Gallia, and I'm here today on behalf of the Apelli University officials, all of whom respectfully ask this court to affirm. Appellant Ben Shapiro spoke on the St. Paul portion of the University of Minnesota's Twin Cities campus in February 2018 before a capacity audience. And his speech was live streamed to those who could not attend. Appellant Students for a Conservative Voice, the student group hosting Mr. Shapiro, raised security concerns about his appearance in their very first written and oral communications with the university about the event. And Mr. Shapiro and Appellant Young America's Foundation, which facilitated Mr. Shapiro's visit, expected coordination with university police. This coordination meant that Mr. Shapiro spoke without interruption and the university bore all costs related to security. It was a successful event. And nonetheless, the appellant sued five university officials for violating their First Amendment right to free speech. The district court. I think one of the questions that we have to wrestle with is how should this court distinguish between genuine security concerns on the one hand and hecklers detail on the other hand, especially where the record seems to show that other speakers with a different ideological viewpoint were were not shuttled off to a remote location. Your Honor, I think there are a couple of things to unpack here. First, with respect to some of the other high profile speakers that the appellants put forth, there are no documented security concerns in the record with respect to any of these speakers. There are there is nothing in the record that suggests that the Angela Davis appearance brought with it the university's own security assessment showed no credible security threat with regard to the Shapiro event. And in fact, that turned out to be the case. The university's own assessment showed a couple of things. It showed that within the year preceding Mr. Shapiro's visit to the university, he had drawn protests on other university campuses. The university had just gone through the planning of a student group event with this same host, Students for a Conservative Voice. And that group had not engaged with university officials until three days before the event, at which point they learned of a protest and only at that point sought to engage university police to help with security concerns. And at the same time, they said, we're inviting Mr. Shapiro. He could produce some controversy. This event will require security. At that point, I think it's incumbent on the university as a steward of an educational institution to take the steps it needs to to secure the event. So you're saying these security issues were somehow different than the president of Somalia or a Supreme Court justice? Well, those are both significantly different events in that they include collaboration with federal security officials. Those are outside groups that bear their own costs. Northrop Auditorium, where those events took place, was not even a venue that the student group ever requested for this event. So the analysis is just it doesn't fit in the same box. And similarly with Representative Omar, the appellants put forward security concerns regarding her, but there is not a single documented security concern in the record with respect to her appearance at a university or in her home district. And she was appearing when she spoke at the Mayo Auditorium in her home district. Specifically, when you look at student group events, the appellants cannot point to a single student group event that raised security concerns that was allowed to go forward in either Willey Hall or Mayo Auditorium. The two venues that they assert were the ideal venues for their event. And to the extent they're trying to assert an implication of viewpoint discrimination, that's belied by the fact that the university officials offered them Ted Mann Concert Hall, a 1,000 seat venue on the West Bank portion of campus, which was a desirable location for them. But they had already committed to a date for Mr. Shapiro's appearance without investigating the availability of any venues on campus. And similarly, to suggest that these venues were placed on hold, when you try to reserve a classroom space in October before the class schedule for spring is established, and this is in the record, those spaces can't be released until the purpose for which those classrooms are devoted, education, until that schedule is set. Let me go back to my initial question. I'm still having trouble seeing how we distinguish between legitimate security concerns and the heckler's veto. Because when you bring up these alleged security concerns with regard to Mr. Shapiro, it sounds like you're facilitating a heckler's veto. Well, the student group is the one that brought up the legitimate security concerns at the outset. They wanted to engage with University of Minnesota police to make sure that the Shapiro event would be successful. And there was no heckler's veto here. The speech happened. It happened, you know, the appellants would characterize it as a remote location. It's part of the main campus. It is the Twin Cities campus. It's in three portions. It's St. Paul. It's the state capital. It's not part of the main campus. I have a map here. It's a remote location. I attended a university with a similar arrangement where you have a main campus and then you have a remote campus where nobody goes. And it seems to me that calling it the main campus is not correct. The record is clear here that there are five colleges housed on the St. Paul campus, that it is accessible by public transportation. Certainly a capacity audience had no trouble getting there on the evening of the Shapiro event. So respectfully, the university does not consider the St. Paul portion of the Twin Cities campus to be a remote location or a challenge to get to. And the heckler's veto doctrine is not applicable here because the speech did happen. The university took steps to make sure that Mr. Shapiro was able to speak. He spoke in a venue of the size that the student group originally requested. And when it was proposed to them, at no point in the record will you find an example of either a representative of Students for a Conservative Voice or the co-host student organization, Collegians for a Constructive Tomorrow, asking any of the university officials at issue in this case to move the event or to complain about the size of the venue or the St. Paul location of the venue. They testified, and it's in the record at page 1557 and 1557 and 58, that they liked both Mr. DeSalt and Lieutenant Buda, found them responsive and good to work with. Yet when Mr. DeSalt reached out to ask how ticket sales were going, they said it had sold out, but they didn't ask at that time whether there was a larger venue available. They never directly spoke to the university officials to ask for a new venue. And the request that came in 10 days before the event that Mr. Warner referred to was a simple request put into the Office of Classroom Management. They did not go to Mr. DeSalt. They did not go to Lieutenant Buda with whom they said they had a good relationship. They put in a request. The Office for Classroom Management had been told by Students for a Conservative Voice that they had already found a location for the Shapiro event, and they had assumed it was a mix-up. That's uncontroverted in the record. I'm unaware of any First Amendment authority for the idea that a university is obligated to affirmatively reach out to a student group to move an event when they haven't been asked. And it's clear that the university's practice with respect to student group events is not to intervene when a group has a wait list. That's in the record at page 795. The university does not reach out to student groups to affirmatively move their events. It lets the student group organize the event, put it in place, and let it proceed at that point. Counsel, I've got a question regarding some inferences that seem to have been made by the district court. Specifically, after the walkthrough of Mayo Auditorium, Defendant Buda expressed concerns and then suggested that instead of the Mayo Auditorium, that they go to St. Paul to the Continuing Ed Center. Then you have a phone call, or actually I think it was an email, from Defendant Clark to that same venue saying that the administration has asked that we move this to St. Paul. Wouldn't a reasonable inference be that they were both working together under the direction of the administration to move them to St. Paul instead of the Minneapolis campus? That might be a reasonable inference at the motion to dismiss stage, but on the record we have before us at summary judgment, it's not reasonable because Chief Clark testified that he made that statement based on the understanding shared with him from Lieutenant Buda that there had been an agreement with the student group that St. Paul was the best location for the event. Subsequently, Chief Clark briefed his direct reports. He briefed Vice President Berthelsen on that agreement and they expressed no problem with it. At that point, he reached out to the Continuing Ed Conference Center to get things moving on locating the event. It's also important to note that the student group rejected the Continuing Education and Conference Center. That email had no impact on the location of the event. From a summary judgment perspective, it's not a material fact. And the appellants had the opportunity and did depose Vice President Berthelsen. They deposed President Kaler, both of whom agreed that they offered no input on the location of the Shapiro event. They did not weigh in. I realize I'm over my time, Your Honor, so unless there are further questions, the university officials would respectfully ask the court to affirm the district court's decisions in all regards. Thank you very much. Thank you, Ms. Galea. Mr. Warner, your rebuttal. Thank you, Your Honor. Just a few points. First, I want to remind the court that there's an unrebutted expert report in this case that found that the more attractive main campus venues have been secured by university officials for speakers with higher risk levels and that these same venues could have been secured with the same resources used for the Shapiro event. And to put this in context, the record shows that the university had approximately 120 officers available for the event for Ben Shapiro. But the expert report, which is unrebutted, said that any of the main campus venues that the students requested could have been secured with approximately 40 to 50 officers. So the question about security and resources there is mitigated substantially by the expert report. And the undisputed fact is Lieutenant Bouda said that university police can secure any venue. Secondarily, it's important to note that the Shaun King event triggered security concerns because, as the university's policy said on its face, any public figure triggers a security concern for the university. And that event was hosted by a student group, but the policy that was applied to the students here was not applied in that event. And Wiley Hall, the exact location that the students wanted all along, was available throughout this whole time and was available even on the day of the Shapiro event. And as this court's own precedents have stated multiple times, but most recently in Jerlick and in the Burnham cases, it's clearly established that students cannot be subject to viewpoint discrimination and a heckler's veto on a university campus. And your honors, I'll end by saying this. Free speech is facing new and dangerous attacks all across the country, but especially on university campuses. Overreaching officials and cancel culture threaten to erode our pluralistic society. Yet for over two centuries, the American people have accepted that tolerance and good faith differences of opinion are essential to a free people. And appellants asked this court to reaffirm that truth today. We ask that this court reverse the lower court and enter summary judgment in favor of appellants. Thank you. Thank you, Mr. Warner. Thank you also, Ms. Gallia. We appreciate both counsel's presentations in support of the briefing you submitted. We'll take the case under advisement and render decision in due course. Thank you. Thank you.